UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| PAMELA CALDWELL,                    ) | Civil Action No.: 3:13-cv-1202-CMC-TER |
|                                              ) | |
| Plaintiff,            ) | |
|                                              ) | |
| -vs-                                      ) | |
|                                              ) | |
|                                              ) | **REPORT AND RECOMMENDATION** |
| CORRECT CARE SOLUTIONS, LLC,  ) | |
|                                              ) | |
| Defendant.         ) | |
| _____ ) | |

## I.     INTRODUCTION

This is an employment case. Plaintiff alleges Defendant failed to accommodate her, discriminated against her, and retaliated against her in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq. At the time this action was filed, Plaintiff was represented by counsel. During the pendency of this case, one of the attorneys of record for Plaintiff passed away and the remaining attorney of record moved to be relieved as counsel. The motion was granted and the undersigned stayed the scheduling order deadlines for thirty days to allow Plaintiff to seek new counsel. Plaintiff has chosen to proceed pro se.

On September 26, 2014, Defendant filed its Motion for Summary Judgment (Document # 54). Because she is proceeding pro se, she was advised pursuant to Roseboro v. Garrison, 528 F.3d 309 (4th Cir. 1975), that a failure to respond to Defendant's motion could result in the motion being granted. Plaintiff did not file a response to Defendant's motion, but filed her own Motion for Summary Judgment (Document # 62).[1] All pretrial proceedings in this case were referred to the

---

[1] Regardless of whether the court construes Plaintiff's Motion for Summary Judgment as a motion or a response to Defendant's motion, the filing is untimely. Plaintiff's Motion for Summary Judgment was filed November 7, 2014. The scheduling order deadline to file dispositive motions was September 26, 2014. Thus, it should be denied as untimely. In addition, the deadline to respond to Defendant's Motion for Summary Judgment was November 3, 2014. Nevertheless, out

undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. This report and recommendation is entered for review by the district judge.

**II.     FACTS**

    **A.     Plaintiff's Employment with Correct Care**

Plaintiff was diagnosed with Multiple Sclerosis (MS) in November 2004. See Compl., ¶ 5. Plaintiff has relapsing and remitting MS, which means sometimes she has relapses or flare-ups of symptoms followed by periods of either partial or complete recovery. Pl. Dep. 92. Correct Care first hired Plaintiff as a Health Services Administrator at its Charleston County Detention Center site in April 2005 at a salary of $65,000 per year. Pl. Dep.156; Pl. Dep. Ex. 8. At some point in 2005, Plaintiff notified Executive Vice President John Bosch she had MS. Pl. Dep. 89-90; Bosch Decl. ¶ 2. As a Health Services Administrator, Plaintiff's responsibilities included, but were not limited to, establishing the appropriate processes and protocols to ensure Correct Care provided appropriate care to inmates in her assigned facility and managing the medical, dental, and mental health program's activities. Pl. Dep. pp. 152, 156; Pl. Dep. Exs. 5, 8. Correct Care terminated Plaintiff's employment on January 15, 2007, but only because its contract to provide medical services to inmates housed at the Charleston County Detention Center ended. Pl. Dep. pp. 90, 160; Pl. Dep. Ex. 11.

Plaintiff testified that in September 2007, Bosch, Jerry Boyle, Chairman and Chief Executive Officer of Correct Care, and Patrick Cummiskey, Director of Marketing at the time of the events at issue here[2], asked her to come back to work at Correct Care's Richland County facility, the Alvin

---

of an abundance of caution, the undersigned will consider Plaintiff's Motion for Summary Judgment as a response to Defendant's Motion for Summary Judgment.

    [2]Cummiskey is currently Correct Care's President of Correctional Healthcare.

S. Glenn Detention Center (ASGDC) and told her that Correct Care would "work with [her] illness." Pl. Dep. 46. Correct Care rehired Plaintiff as a Health Services Administrator at ASGDC on November 1, 2007, at a salary of $80,000 per year. Pl. Dep. 163; Pl. Dep. Ex. 13. Plaintiff commuted back and forth from her home in Charleston to ASGDC in Columbia daily. Pl. Dep. 124. During Plaintiff's tenure at ASGDC, Kathy Harrell was the Assistant Director of the facility.[3] Pl. Dep. 41. At some point in 2008, Harrell informed Plaintiff she needed to be in the office at 8:00 a.m. every day. Pl. Dep. 42; Harrell Decl. ¶ 7.

Correct Care's contract with Richland County requires both a physician and the Health Services Administrator to be on-site forty (40) hours each week. Pl. Dep. 59, 82. If these contract terms are not met, Correct Care's client, Richland County, can terminate the contract. Bosch Decl. ¶ 7; Tigges Decl. ¶ 4.

On October 1, 2008, Bosch approved Plaintiff's promotion to the position of Regional Manager and a corresponding increase in her salary to $87,500 per year. Pl. Dep. Ex. 21. Six months later, Plaintiff returned to the position of Health Services Administrator on April 1, 2009, under the supervision of Regional Manager Todd Schwartz.[4] However, Plaintiff's salary remained $87,500 per year. Pl. Dep. 111; Pl. Dep. Ex. 21. Plaintiff received a merit increase to a salary of $90,125 per year on September 28, 2009. Pl. Dep. Ex. 21. Upon Schwartz's resignation from employment, Bosch supervised Plaintiff. Pl. Dep. 31. Plaintiff applied for the open Regional Manager position in March of 2011, but Bosch told her "as a friend, I don't think you can do the traveling for the [Regional Manager] position." Pl. Dep. 22, 24. Correct Care selected Nancy Tigges to be the

---

[3] Harrell was an employee of Richland County. Harrell Decl. ¶¶ 2-3.

[4] It is not clear from the record why Plaintiff returned to the position of Health Services Administrator.

Regional Manager in May of 2011. Pl. Dep. 31; Bosch Decl. ¶ 11.

### B.     Plaintiff's FMLA Leave

Plaintiff requested and was granted FMLA leave several times during the course of her employment with Correct Care. Correct Care granted Plaintiff's request for FMLA leave for her own medical conditions (inflamed liver and MS) in October 2009. Pl. Dep. 213-214; Pl. Dep. Ex. 30. In 2010, Correct Care granted Plaintiff's request for FMLA leave to care for her mother. Pl. Dep.215; Pl. Dep. Ex. 31. Plaintiff applied for, and Correct Care granted, an additional request for FMLA leave from September 6, 2011 - September 13, 2011. Pl. Dep. 65-66, 177, 216; Pl. Dep. Ex. 21 (DEF 0194-0195).[5]

In June of 2011, Plaintiff asked Bosch to adjust her start time to 9:00 a.m. on Monday mornings because she needed additional time to get up, get dressed and drive from Charleston to Columbia. Pl. Dep. 76, 103. She needed the extra time only on Mondays. Pl. Dep. 76, 134-35. Bosch told Plaintiff he would "talk to the client about it." Pl. Dep. 72-73. Plaintiff never gave Correct Care any notes from her doctor stating she needed additional time to get up, get dressed and drive from Charleston to Columbia. Pl. Dep. 104. After not hearing back from Bosch, Plaintiff spoke to Human Resources Coordinator Clair Creasey who suggested she apply for FMLA leave. Pl. Dep. 77. At Creasey's suggestion, Plaintiff applied for, and Correct Care approved, her first request for intermittent FMLA leave[6] on June 20, 2011. Pl. Dep. 176-77; Pl. Dep. Ex. 21 (DEF

---

[5] The documents located at Plaintiff's Deposition Ex. 21, Employee Action Forms, provide no detail as to the reason for the requested FMLA leave.

[6] Intermittent FMLA leave is defined as "FMLA leave taken in separate blocks of time due to a single qualifying reason." 29 CFR § 825.202(a). Examples of intermittent FMLA leave include "leave taken on an occasional basis for medical appointments, or leave taken several days at a time spread over a period of six months, such as for chemotherapy. A pregnant employee may take leave intermittently for prenatal examinations or for her own condition, such as for periods of severe morning sickness." 29 CFR § 825.202(b)(1).

0198-0199). Bosch told Plaintiff "you're killing me because you can't get your butt out of bed." Pl. Dep. 20-21. Correct Care approved Plaintiff's second request for intermittent FMLA leave on September 20, 2011. Pl. Dep. Ex. 21 (DEF 0190-0191).[7] Correct Care granted Plaintiff FMLA leave each time she asked. Pl. Dep. 71.

### C. Plaintiff's Complaints About Bosch

Plaintiff felt that Bosch's comment was discriminatory and harassing. Pl. Dep. 22. Plaintiff talked to Regional Vice President Kim Palmer about her feeling, but does not remember telling Palmer about Bosch's comment. Pl. Dep. 22-23. Plaintiff told former Human Resources Director Mel Waymaster that Bosch needed employee interaction training, but did not report Bosch's alleged comments to Waymaster. Pl. Dep. 23-24. Plaintiff told Creasy that "[Bosch] is treating me differently because I'm having to take off for medical reasons." Pl. Dep. 113. She also told Cummiskey all "that [Bosch] was doing and how he was acting and how nasty he was being." Pl. Dep. 114. However, she does not remember whether she told Cummiskey that Bosch was doing these things because of her disability. Pl. Dep.114-115; Cummiskey Decl. ¶ 9. Plaintiff also asserts that she complained about Bosch to another Regional Manager named Wanda Streeter, but she cannot remember whether she told her that Bosch was mistreating her because of her medical condition. Pl. Dep. 115-117.

Plaintiff asserts that, in 2011, Correct Care was trying to find the "cheapest way" to provide health benefits to its employees. Pl. Dep. 54. Plaintiff testified that Cummiskey once stated about

---

[7] Since at least November 2007, Correct Care had a policy or practice requiring Health Services Administrators to provide doctors' excuses to the company when they were out of work due to an illness or medical condition. Pl. Dep. 210. However, Plaintiff did not consistently provide copies of her medical excuses to Correct Care because sometimes she would forget to ask for one from her doctor. Pl. Dep. 212; Bosch Decl. ¶ 14.

a nurse with multiple health problems that "those are the ones we'd like to see on their husband's plans to assist us to keep our costs down." Pl. Dep. 54-55. Plaintiff admits Cummiskey's comment did not show any discriminatory attitude (either his or the Company's) toward her, and she did not report Cummiskey's comments to anyone at Correct Care. Pl. Dep. 56, 122-123.

### D.     Plaintiff's Termination

In January of 2012, Harrell reported to Correct Care concerns about Plaintiff failing to provide coverage for a vacationing physician because Correct Care's contract with Richland County requires that a physician be available and on-site forty hours each week. Pl. Dep. 81-82; Harrell Decl. ¶¶ 4, 9-10; Boddie Decl. ¶¶ 4, 11. Correct Care requires the facility's physician or its Health Services Administrator to provide coverage when the facility's physician is going to be out on vacation or extended leave that would otherwise leave a site uncovered by a doctor. Palmer Dep. 24-26. If a relief physician is not available for a particular facility, Correct Care can provide doctors who work out of the company's home office in Nashville, Tennessee. Palmer Dep. 24-26. Correct Care also has a medical director and assistant medical director who can cover for any physician. Palmer Dep. 24-26.

In December 2011, ASGDC's physician, Dr. Yates, was scheduled to be on vacation for a few days. Pl. Dep. 81, 86. It was Plaintiff's job to ensure ASGDC had physician coverage for forty hours per week. Pl. Dep. 85. Plaintiff testified that Dr. Miles, the physician for the Lexington County Detention Center, was the only physician available to provide coverage. Pl. Dep. 130. Plaintiff arranged with Dr. Miles to provide at least 24 hours of coverage while Dr. Yates was on vacation. Pl. Dep. 88. However, Dr. Miles did not show up to work on the first day he was to begin covering for Dr. Yates. Pl. Dep. 81. Plaintiff was at work on that day, but testified that "[n]obody told me that [Dr. Miles] did not show up." Pl. Dep. 81-82.

Correct Care had previously warned Plaintiff in May 2011 about failing to schedule sufficient relief coverage for Dr. Yates. Pl. Dep. 83; Tigges Decl. ¶¶ 8-9. Plaintiff admits a relief physician was not on-site for 40 hours one week in May 2011, and Correct Care told her it could not happen again. Pl. Dep. 83.

On January 12, 2012, Kristin Marzol, a former nurse at the Lexington County Detention Center, informed Tigges that Plaintiff posted a message ("Keep smiling, What goes around comes around.") on Marzol's Facebook page. Tigges asked Marzol to print the message and bring it to her the next day. Pl. Dep. 243-46; Pl. Dep. Ex. 40; see also Popp Decl. ¶ 7; Tigges Decl. ¶ 12. Stephanie Popp, Correct Care's Director of Employee Relations and Compliance in Nashville, Tennessee, was copied on the correspondence. Popp. Decl. ¶ 7. Marzol had resigned from her employment a week before Plaintiff posted the message on Marzol's Facebook page and Plaintiff testified that Marzol had "some private issues going on in her life." Pl. Dep. 243. It was Tigges' and Popp's understanding that Marzol felt threatened by the comment. Tigges Decl. ¶ 12; Popp Decl. ¶ 7. Plaintiff and Marzol were friends, and Plaintiff testified she was only telling Marzol to watch her back because what "comes around is going around" and that she did not mean anything by her comment. Pl. Dep. 243-44.

Correct Care terminated Plaintiff on January 23, 2012. Pl. Dep. 249. Tigges was present at Plaintiff's termination meeting and Palmer participated by phone. Pl. Dep. 249. Plaintiff acknowledges she was told that she was terminated because she "did not provide doctor coverage and that [she] caused a hostile work environment." Pl. Dep. 128, 250; see also Tigges Decl. ¶¶ 11, 13. Palmer testified that Plaintiff's medical condition was not discussed with Palmer at any time during the termination process. Palmer Dep. 16, 33. In fact, prior to Plaintiff filing her complaint, Palmer did not know Caldwell has MS. Palmer Dep. 31.

### E. Plaintiff's Charge of Discrimination

Plaintiff submitted an Intake Questionnaire to the Equal Employment Opportunity Commission (EEOC) on May 17, 2012. Pl. Dep. 178, 180; Pl. Dep. Ex. 22. On December 5, 2012, Plaintiff filed her Charge of Discrimination with the EEOC. Pl. Dep. 201; Pl. Dep. Ex. 26. The EEOC issued a Right to Sue letter on December 26, 2012. Pl. Dep. 203; Pl. Dep. Ex. 27. Plaintiff filed her complaint in this action in the Court of Common Pleas, Richland County, South Carolina, on March 21, 2013. Pl. Dep. 78; Pl. Dep. Ex. 3. Correct Care removed the action to this court on May 2, 2013.

## III. STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. at 322. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary

judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

**IV.    DISCUSSION**

    **A.    Timeliness of Charge of Discrimination**

Before filing suit under the ADA, a plaintiff must first exhaust her administrative remedies by bringing a timely charge of discrimination with the EEOC. See 42 U.S.C. § 12117(a) (ADA) (indicating that the procedures of the ADA are identical to those provided in Title VII); 42 U.S.C. § 2000e–5(e) (Title VII); Davis v. Virginia Commonwealth Univ., 180 F.3d 626, 628 n. 3 (4th Cir.1999) (ADA); The ADA establishes two possible limitation periods for filing a discrimination charge with the EEOC. See 42 U.S.C. § 12117(a)(ADA); 42 U.S.C. § 2000e–5(e)(1) (Title VII). The standard limitations period for filing a charge is 180 days after the alleged unlawful employment practice. Id. The limitations period is extended to 300 days, however, when state law proscribes the alleged employment practice and the charge has initially been filed with a state or local deferral agency. See 42 U.S.C. § 2000e–5(e)(1).

Thus, when a plaintiff chooses to file her charge only with the EEOC and not with a state or local deferral agency, the charge must be filed within 180 days of the alleged unlawful employment practice. See, e.g., Middleton v. Motley Rice, LLC, 2010 WL 3167375, at *11, n. 7 (D.S.C. May 4, 2010) (180–day filing period applied because plaintiff filed her charge only with the EEOC and not with the South Carolina Human Affairs Commission); Keeshan v. Eau Claire Co-op. Health Ctrs., Inc., 2007 WL 2903962, at *4, n. 2 (D.S.C. Oct.2, 2007) (noting that plaintiff who chooses to file a charge only with the EEOC must do so within 180 days of the alleged discriminatory act).

However, as noted by the Fourth Circuit, "where 'a charge is filed with the EEOC prior to exhaustion of state or local remedies, the Commission refers the complaint to the appropriate local agency.'" Davis v. North Carolina Dep't of Correction, 48 F.3d 134, 137-38 (4th Cir. 1995) (citing New York Gaslight Club, Inc. v. Carey, 447 U.S. 54, 64, 100 S.Ct. 2024, 2031, 64 L.Ed.2d 723 (1980)).

> For purposes of the 300–day limitations period, . . . "when the relevant state agency has entered into a work sharing agreement with the EEOC and that agreement states that each agency will serve as the agent of the other for the purpose of receiving charges, it is well-settled law that a charge filed with the EEOC is 'constructively filed' with the state agency either on the same day that the charge was filed with the EEOC or on the day that the EEOC refers the complaint to the state agency." Peterson v. State of Cal. Dept. of Corrections and Rehabilitation, 319 Fed. Appx. 679, 680 (9th Cir.2009) (quoting EEOC v. Commercial Office Products Co., 486 U.S. 107, 112–113, 125, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988) (holding that the 300–day federal limitations period applied to a claim that the plaintiff filed only with the EEOC 290 days after the discriminatory act, and stating that "[t]he EEOC's referral of a charge initially filed with the EEOC to the appropriate state or local agency properly institutes the agency's proceedings within the meaning of the Act"); Puryear v. County of Roanoke, 214 F.3d 514, 519 (4th Cir .2000).

Adams v. U.S. Airways, Inc., No. 2:10-1658-RMG-BHH, 2011 WL 1326054, *3 (D.S.C. March 16, 2011) (Report and Recommendation), adopted 2011 WL 1261451 (D.S.C. Apr. 5, 2011), affirmed 451 Fed.Appx 293 (4th Cir. 2011). The District has traditionally assumed the existence of such a

workshare agreement between South Carolina and the EEOC. See Brown v. Berkeley County School Dist., 339 F.Supp.2d 715, 721 n. 3 (D.S.C.2004); Grooms v. Mobay Chem. Corp., 861 F.Supp. 497, 503 & n. 7 (D.S.C.1991).

Plaintiff's termination occurred on January 23, 2012, and all other alleged discriminatory events occurred before that time. Plaintiff filed her Charge of Discrimination with the EEOC[8] on December 5, 2012. Accordingly, applying the 300-day limitations period, Plaintiff's Charge of Discrimination was untimely filed.[9] However, the question arises whether Plaintiff's EEOC Intake Questionnaire, filed May 17, 2012, can be considered a charging document for purposes of satisfying the limitations period. The United States Supreme Court has held that for a questionnaire to be considered as a charge it "must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." Federal Express Corp. v. Holowecki, 552 U.S. 389, 402, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008). This court previously addressed this issue in Adams. There, the intake questionnaire completed by the plaintiff specifically stated that "'[w]hen this form constitutes the only timely written statement of allegations of employment discrimination, the Commission will, consistent with 29 C.F.R. 1601.12(b) and 29 C.F.R. 1626.8(b), consider it to be a sufficient charge of discrimination under the relevant statute(s).'" Adams, 2011 WL 1326054, * 4. The court found this statement, along with the exhaustive nature of the questionnaire, to manifest an intent by the complainant to request that the agency take remedial action. The Holowecki court noted that it would extend a

---

[8] The court notes that, above the signature line, the Charge of Discrimination states "I want this charge filed with both the EEOC and the State or local agency, if any." Charge of Discrimination, Pl. Dep. Ex. 26.

[9] The only claims that can be included in a December 5, 2012, claim are those that occurred on or after February 9, 2012.

"measure of respect," to the determination by the EEOC that an intake questionnaire constituted a charge as a reasonable exercise of the EEOC's authority. Holowecki, 552 U.S. at 398.

The intake questionnaire at issue here does not include the exact language discussed in Adams. However, it does provide that "[c]onsistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge." EEOC Intake Questionnaire, Pl. Dep. Ex. 22. Under the ADA, by way of Title VII, a charge must "contain such information and be in such form as the [EEOC] requires. 42 U.S.C. § 2000e-5(b). Pertinent sections of the EEOC regulations provide that a charge should contain the name, address and telephone number of the person making the charge and of the person against whom the charge is filed, a clear and concise statement of the facts, including pertinent dates and the alleged unlawful practices, the approximate number of employees of the employer, and whether other proceedings have been commenced with other agencies. 29 CFR § 1601.12(a). In addition, Section 1601.12(b)[10] provides that "a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of."

In addition, with respect to form, the ADA, by way of Title VII, requires that a charge be "in writing under oath or affirmation." 42 U.S.C. § 2000e–5(b); see also 29 C.F.R. § 1601.9 (establishing that a Title VII charge "shall be in writing and signed and shall be verified"). EEOC regulations define "verified" to mean "sworn to or affirmed before a notary public, designated representative of the [EEOC] or other person duly authorized by law ..., or supported by an unsworn declaration in writing under penalty of perjury." 29 C.F.R. § 1601.3. An unverified document that

---

[10] Section 1626.8(c) addresses amendments to a charge, which is not applicable here.

-12-

satisfies the other substantive requirements for a charge can be cured by a later-filed charge that is verified, in which case the verified charge relates to the filing date of the unsworn charge. See 29 C.F.R. § 1601.12(b); Edelman v. Lynchburg Coll., 535 U.S. 106, 118, 122 S.Ct. 1145, 152 L.Ed.2d 188 (2002) (upholding relation back). Although EEOC regulations characterize the failure to verify a charge as a "technical defect," 29 C.F.R. § 1601.12(b), the Fourth Circuit has held that compliance with this verification requirement is "mandatory," Balazs v. Liebenthal, 32 F.3d 151, 156 (4th Cir.1994).

Substantively, the questionnaire provides all of the information required by the EEOC, including a three-page narrative description, answering the question "What happened to you that you believe was discriminatory?" The document is signed by Plaintiff and witnessed by a notary, but is not under oath or declared to be accurate under penalty of perjury. Nevertheless, her subsequent charge of discrimination is sworn before a notary and is declared under penalty of perjury to be true and correct. Furthermore, the questionnaire includes two boxes, one which states, inter alia, "I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above" and another that states "I want to talk to an EEOC employee before deciding whether to file a charge of discrimination." EEOC Questionnaire, Pl. Dep. Ex. 22. Plaintiff checked the box indicating that she wanted to file a charge of discrimination, and acknowledged her understanding that "**the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name**." EEOC Questionnaire, Pl. Dep. Ex. 22. See, e.g., Enoch v. Becton, Dickinson & Co., No. ELH–11–2251, 2012 WL 2371049, at *6 (D.Md. June 22, 2012) (holding that the Holowecki test is satisfied where a filer chooses the first option). Therefore, for these reasons, Plaintiff's EEOC questionnaire satisfies the ADA and EEOC requirements and can "be reasonably construed as a request for the

-13-

agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." Holowecki, 552 U.S. at 402. Accordingly, the appropriate date for determining the timeliness and/or scope of Plaintiff's administrative actions is the date the EEOC questionnaire was filed, May 17, 2012.

Applying a 300-day limitations period, an administrative charge filed on May 17, 2012, is timely only as to discriminatory acts occurring on or after July 22, 2011. In her complaint, Plaintiff alleges that Defendant failed to accommodate her by not adjusting her start-time to 9:00 a.m. on Monday mornings instead of 8:00 a.m. The record reveals that Plaintiff made this request sometime in June of 2011. Thus, Plaintiff's charge was not timely as to this alleged act of discrimination. Plaintiff also alleges that she was terminated because of her disability. It is undisputed that she was terminated on January 23, 2012. Thus, her charge was timely filed as to this alleged act of discrimination. Finally, Plaintiff alleges that Defendant retaliated against her for making complaints of discrimination based on her disability. It appears that the act of retaliation alleged by Plaintiff was her termination. Therefore, the charge was timely filed as to this claim as well. Accordingly, the only claims timely presented to the EEOC and properly before this court are the claims of discrimination and retaliation with respect to Plaintiff's termination. As such, the court will address those claims in turn.

### B.     Discrimination

The ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Violations of the ADA occur when the employer either wrongfully discharges

a qualified individual with a disability or fails to make reasonable accommodations for him. Rhoads v. F.D.I.C., 257 F.3d 373, 387 n. 11 (4th Cir.2001).

The Fourth Circuit has held that the causation and burden-shifting standards applicable in Title VII cases as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)[11] are also applicable in cases brought pursuant to the ADA "where the defendant disavows any reliance on discriminatory reasons for its adverse employment action." Ennis v. Nat'l Assoc. Of Business and Educ. Radio, 53 F.3d 55, 58 (4th Cir.1995). Under the analysis set forth in McDonnell Douglas, Plaintiff has the initial burden of demonstrating a prima facie case of discrimination. Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002). If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the Plaintiff's discharge. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination. Reeves, 530 U.S. at 143.

To establish a prima facie case of discriminatory discharge under the ADA, a plaintiff must show that (1) she was a "qualified individual with a disability;" (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances

---

[11] The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

of her discharge raise a reasonable inference of unlawful discrimination. Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir.2001).

Defendant first argues that Plaintiff has failed to show that she is a qualified individual with a disability. For purposes of the ADA, a person is disabled when he has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) [is] ... regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C). Defendant does not dispute that multiple sclerosis is an impairment, but argues that Plaintiff has failed to show that her multiple sclerosis substantially limits one or more major life activities. "A physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA. The statute requires an impairment that substantially limits one or more of the major life activities." Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 726 (5th Cir.1995).

Although the ADA does not define "major life activities," the Fourth Circuit interprets them to be "activities that are of central importance to daily life" and "that the average person in the general population can perform with little or no difficulty." Rohan v. Networks Presentations, LLC, 375 F.3d 266, 274 (4th Cir.2004). The regulations provide a non-exhaustive list of major life activities, including "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(I). "Substantially limits" is to be "construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA" and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(I). Although Plaintiff points to no evidence that her MS substantially limits a major life activity, the EEOC regulations set forth certain impairments that, "it should be easily concluded," substantially limit, at least one major life activity. 29 C.F.R. §

1630.2(3)(iii). Specifically, it provides that "multiple sclerosis substantially limits neurological function." 29 C.F.R. § 1630.2(3)(iii). Neurological function is not one of the major life activities Plaintiff even alleges in her complaint to be substantially limited by her multiple sclerosis. Nevertheless, it is unnecessary to determine whether Plaintiff is a qualified individual with a disability because she fails to show that she was meeting her employer's legitimate expectations at the time of the adverse employment action.

It was Plaintiff's job to ensure ASGDC had physician coverage for forty hours per week. Pl. Dep. 85. In May of 2011, Correct Care warned Plaintiff about failing to schedule sufficient relief coverage for Dr. Yates. Pl. Dep. 83; Tigges Decl. ¶¶ 8-9. Plaintiff admits a relief physician was not on-site for 40 hours one week in May 2011, and that Correct Care told her it could not happen again. Pl. Dep. 83. Nevertheless, again in December of 2011, Plaintiff failed to have sufficient coverage for Dr. Yates while he was on vacation for a few days. Plaintiff testified that Dr. Miles, the physician for the Lexington County Detention Center, was the only physician available to provide coverage. Pl. Dep. 130. Plaintiff arranged with Dr. Miles to provide at least 24 hours of coverage while Dr. Yates was on vacation. Pl. Dep. 88. However, Dr. Miles did not show up to work on the first day he was to begin covering for Dr. Yates. Pl. Dep. 81. Plaintiff was at work on that day, but testified that "[n]obody told me that [Dr. Miles] did not show up." Pl. Dep. 81-82. Plaintiff acknowledged that Richland County could terminate its contract with Correct Care if it failed to meet its contractual obligation to have a physician on site 40 hours per week. Pl. Dep. 82; see also Harrell Decl. ¶¶ 4, 9-10; Boddie Decl. ¶¶ 4, 11.

In her Motion for Summary Judgment, Plaintiff asserts that "no evidence has been presented to the Court by Correct Care Solutions that this [failure to provide proper physician coverage] was not still an on-going practice after Plaintiff was terminated." Pl. Motion for Summary Judgment p.

1. Plaintiff misunderstands the burden of proof. It is Plaintiff's burden to present evidence sufficient to show that she was meeting her employer's legitimate expectations, not Correct Care's burden to prove that she was not. Furthermore, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Reeves, 530 U.S. at 143. Plaintiff has the burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against her. Id. Because Plaintiff fails to meet her burden in this case, summary judgment is appropriate as to her ADA discrimination claim.

### C.     Retaliation

Plaintiff also alleges that Correct Care retaliated against her for complaining of discrimination in violation of the ADA. The ADA prohibits an employer from retaliating against an employee for engaging in protected activity, that is, "oppos[ing] any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this chapter." 42 U.S.C. § 12203(a). To establish a prima facie claim for retaliation under the ADA, a plaintiff must show: 1) that he engaged in a protected activity, 2) his employer acted adversely against him, and 3) the protected activity was "causally connected" to the employer's adverse action. Rhoads v. FDIC, 257 F.3d 373, 392 (4th Cir.2001).

Plaintiff suffered an adverse employment action when Correct Care terminated her employment. In her complaint, she alleges that she engaged in protected activity when she complained to human resources that her supervisor, Bosch, was treating her differently because of her medical condition. Complaint, ¶¶ 10, 18. The record reveals that Plaintiff told Creasy, the Human Resources Coordinator, that "[Bosch] is treating me differently because I'm having to take off for medical reasons." Pl. Dep. 113. Defendant argues that this complaint does not amount to

protected activity because Plaintiff did not complain that Bosch was treating her differently because of her multiple sclerosis.  To constitute protected activity, a plaintiff must have conveyed to the employer a reasonable belief that the actions complained of violated federal law. <u>Jordan v. Alternative Res. Corp.</u>, 458 F.3d 332, 340–41 (4th Cir.2006) (stating that "an employee seeking protection from retaliation must have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress") (citing <u>Equal Employment Opportunity Comm'n v. Navy Federal Credit Union</u>, 424 F.3d 397 (4th Cir.2005)).  The evidence in the record on this issue is weak but sufficient to show that Plaintiff believed she was complaining of conduct violative of the ADA. [12]

However, Plaintiff fails to present evidence sufficient to show a casual connection between her complaint to Creasy about Bosch and her termination.  "[A] causal connection for purposes of demonstrating a <u>prima facie</u> case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." <u>Price v. Thompson</u>, 380 F.3d 209, 213 (4th Cir.2004). However, the temporal nexus between two events cannot provide proof of causation unless the "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" was "very close." <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation marks omitted).  Here, Plaintiff complained about Bosch to Creasy sometime before June 20, 2011, when Plaintiff's request for intermittent FMLA leave was approved.  Pl. Dep. 113.  She was terminated on January 23, 2012. In <u>Clark</u>, the Supreme Court did not define "very close," but cited cases where adverse employment

---

[12] Plaintiff also complained to others about Bosch's conduct, but either did not or cannot remember whether she complained this his treatment was a result of her disability or medical condition. <u>See</u> section II.C. Plaintiff's Complaints about Bosch, <u>supra</u> pp. 5-6.

action was taken three months and four months after the protected activity as insufficient proximity. See id. at 273–74 (citing Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir.1997), Hughes v. Derwinski, 967 F.2d 1168, 1174–75 (7th Cir.1991); see also Shields v. Fed. Exp. Corp., 120 F.App'x 956, 963 (4th Cir.2005) (holding that three to four months was insufficient temporal proximity). While other relevant evidence may be used to support a claim of causal connection where temporal proximity is lacking, Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir.2007), Plaintiff has failed to proffer any such evidence.[13] Therefore, she fails to show a causal connection between her termination and her complaints.

In sum, Plaintiff has failed to present sufficient evidence to create a genuine dispute of fact as to whether Correct Care intentionally discriminated against her or retaliated against her in violation of the ADA. Accordingly, summary judgment in Correct Care's favor is proper.

**V.     CONCLUSION**

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (Document # 54) be granted, Plaintiff's Motion for Summary Judgment (Document # 62) be denied as untimely or, alternatively, on the merits, and this case be dismissed in its entirety.[14]

                                                          s/Thomas E. Rogers, III
                                                          Thomas E. Rogers, III
                                                          United States Magistrate Judge

May 27, 2015
Florence, South Carolina

**The parties are directed to the important information on the following page.**

---

[13] For instance, there is no evidence that any of the decisionmakers with respect to Plaintiff's termination, including Bosch, were aware of Plaintiff's complaints about Bosch.

[14] If this report and recommendation is accepted by the District Judge, the remaining pending motions will be moot.